**WO**

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| National Fire Insurance Company of Hartford, *et al.*; | No. CV-11-01220-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Richard Jay Lewis, M.D., *et al.*; | |
| Defendants. | |
| Advanced Cardiac Specialists, Chartered, *et al.*, | |
| Third-Party Plaintiffs, | |
| v. | |
| Medical Protective Company, *et al.*, | |
| Third-Party Defendants. | |
| Medical Protective Company, *et al.*, | |
| Third-Party Counterclaimants, | |
| v. | |
| Advanced Cardiac Specialists, Chartered, *et al.*, | |
| Third-Party Counterdefendants. | |

Several motions relating to insurance coverage are pending before the Court. This order attempts to dispose of all such motions. The motions resolved by this order are more specifically identified below.[1]

## FACTUAL BACKGROUND

The parties to this case are engaged in an insurance coverage dispute brought in this Court by various insurers.

Some of the Defendants to this action[2] (the "Underlying Plaintiffs") have filed eight separate complaints in Arizona Superior Court against other Defendants.[3] The Defendants in the underlying actions include Richard Jay Lewis, M.D., his spouse Lisa Hara Levin-Lewis, Advanced Cardiac Specialists, Chartered ("ACS") which employed Dr. Lewis as a cardiologist, Robert M. Siegel, M.D.,[4] who was the President, sole director, and sole shareholder of ACS, and Dr. Barbara Barker-Siegel, his spouse.

The Underlying Plaintiffs allege, with some variation, that during the course of their treatment Dr. Lewis inappropriately viewed and sexually assaulted them. (Doc. 79 ¶¶ 15-23; Doc. 111 ¶¶ 15-23.) Underlying Plaintiffs Pummill, Larsen, Landsverk, and Saylor also allege that Dr. Lewis recommended and performed unnecessary pacemaker

[1] The Parties' requests for oral argument are denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

[2] Dena and Shawn Larsen, Franklin and Jennifer Saylor, Collin and Laurie Shook, Julie and Stewart Landsverk, Kellye Pummill, Daniel and Elizabeth Piper, Lauri A. Tupper, and Brooke E. Staley.

[3] Prior to the filing of this Order, the Court received notice from the Parties that all claims had been settled between National Fire, Transportation, Medical Protective, Lexington, the Shooks, Tupper, and Staley. (Doc. 256.) This Order will have no effect on them, as the Parties have informed the Court that a joint motion and stipulation for dismissal is forthcoming. (Doc. 256; Doc. 268.) The case, however, remains live as to the other five Underlying Plaintiffs.

[4] Dr. Robert Siegel died in a plane crash on May 10, 2012. (Doc. 158.) On September 18, 2012, the Court granted the motions to substitute Barbara Barker-Siegel, his personal representative, in the place of Dr. Robert Siegel. (Doc. 264.)

surgeries on them. (Doc. 79, Ex. 1 at 10 (Pummill Compl. ¶ 28), 110 (Landsverk Compl. ¶ 17); Doc. 111, Ex. 12 (Saylor Amend. Compl. ¶¶ 16, 24); Doc. 165, Ex. 1 ¶ 30.)

All Underlying Plaintiffs bring claims arising from the alleged inappropriate actions of Dr. Lewis, including: (1) Assault and Battery; (2) Negligence—Medical Malpractice; (3) Intentional or Negligent Infliction of Emotional Distress and Invasion of Privacy. (Doc. 79 ¶¶ 24-35; Doc. 111 ¶¶ 24-35, Ex. 12.) The Complaints allege not only that Dr. Lewis and his wife are liable for these three counts, but that ACS, Dr. Siegel, and Dr. Barker-Siegel (collectively, "the ACS Defendants") are vicariously liable under Arizona law for Dr. Lewis's actions. (Doc. 79 ¶¶ 25-27, 29, 30-35; Doc. 111 ¶¶ 25-27, 29, 30-35, Ex. 12.) The Complaints also state causes of action directly against the ACS Defendants for the negligent hiring, retention, and supervision of Dr. Lewis. (*Id.*)[5] Finally, Pummill, Larsen, Landsverk, and Saylor allege separate claims for medical negligence against Dr. Lewis and the ACS Defendants for performing unnecessary pacemaker surgery on them, as well as derivative negligence claims against the ACS Defendants.

On January 6, 2010, Dr. Lewis was indicted on 46 counts of sexual abuse, 14 counts of assault, and one count of sexual assault in Arizona state court. (Doc. 139, Lexington SOF ¶ 14; Doc. 183 ¶ 14; Doc. 212 ¶ 14.) Seven of the eight Underlying Plaintiffs were among the listed victims. (Doc. 139, Lexington SOF ¶ 15; Doc. 183 ¶ 15; Doc. 212 ¶ 15.) Dr. Lewis subsequently pled guilty on May 10, 2012, to 18 counts of

---

[5] Minor variations exist among the complaints. The Larsens seek to hold only Dr. Lewis liable for intentional infliction of emotional distress, and negligence, Dr. Lewis and ACS liable for assault and battery, and Dr. Siegel liable under A.R.S. § 10-2234 for failure to supervise. (Doc. 79, Ex. 1, Larsen Compl.) In addition, Piper does not seek to hold Dr. Barker-Siegel vicariously or directly liable for any of the claims. (Doc. 79, Ex. 1, Piper Compl.) For the sake of clarity in the Order, the Court will not constantly make this distinction between the other six complaints and the two described here, but these distinctions  matter for coverage purposes as will be occasionally referenced throughout this order.

aggravated assault, a class 6 felony, involving the same seven Underlying Plaintiffs.[6] (Doc. 169, Ex.1 at 7-11; Doc. 165, Ex. A at 19-54; Doc. 139, Ex. 1 at 2-15.)

Plaintiffs National Fire Insurance Company of Hartford and Transportation Insurance Company (the "General Liability Insurers") issued separate but essentially identical Businessowner Liability Insurance Policies ("the businessowner policies") to ACS that collectively cover the period from May 1, 2007, to May 1, 2010. (Doc. 79 ¶¶ 36-37; Doc. 111, ¶¶ 36-37.) The businessowner policies provide coverage for "bodily injury" caused by a non-excepted "occurrence" during the policy time period. (Doc. 79 ¶ 38; Doc. 111 ¶ 38.) The General Liability Insurers have undertaken a defense of the ACS Defendants against the underlying complaints under a complete reservation of rights. (Doc. 79 ¶ 50-51; Doc. 111 ¶ 50-51.)

Plaintiff Medical Protective Company issued consecutive claims-made professional liability policies to the ACS Defendants and Dr. Lewis for the period of May 1, 2008, through May 1, 2010. (Doc. 137, Medical Protective SOF ¶ 17, 19; Doc. 183 ¶ 17, 19.) The 2009-10 policy included an Extended Reporting Period Endorsement as to Dr. Lewis with a retroactive date of February 23, 2006. (Doc. 137, Medical Protective SOF ¶ 20; Doc. 183 ¶ 20.) Pursuant to its terms, the 2009-10 policy was cancelled with regard to the ACS Defendants as of March 1, 2010. (Doc. 137, Medical Protective SOF ¶ 21; Doc. 183 ¶ 21.) The Medical Protective policies contain two distinct insurance agreements: the "physicians" policy and the "corporate" policy. (Doc. 59, Ex. B at 5.) ACS, Dr. Lewis, Dr. Siegel, and Dr. Barker-Siegel are all named insureds under the physicians agreement. (*Id.* at 10-11.) ACS and its agents are insureds under the corporate agreement. (*Id.* at 6-7.)

---

[6] Underlying Plaintiff Staley was not among the victims listed on the indictment or in the plea agreement. She has, however, reached a settlement with the insurers. (Dco. 256; Doc. 268.)

- 4 -

Plaintiff Lexington Insurance Company ("Lexington") issued consecutive claims-made Medical Group Professional Liability and Administrative Proceedings Insurance Policies (the "Lexington policies") to the ACS Defendants that covered "sums that an Insured becomes legally obligated to pay others as damages resulting from a medical incident arising out of professional services." (Doc. 139, Lexington SOF ¶¶ 17-20, 24; Doc. 183 ¶¶ 17-20, 24; Doc. 212 ¶¶ 17-20, 24.) The Lexington policies picked up where the Medical Protective policies left off and covered the period from March 1, 2010, thorough March 1, 2012. (Doc. 139, Lexington SOF ¶¶ 17-19; Doc. 183 ¶¶ 17-19, Doc. 212 ¶¶ 17-19.)

The insurers instituted the present declaratory judgment action on June 21, 2011, seeking a declaration that the businessowner policies, the Medical Protective policies, and the Lexington polices do not provide coverage for the allegations contained in the underlying complaints against the Lewis and ACS Defendants, and that the insurers therefore have no duty to defend the Lewis and ACS Defendants in the underlying actions. First, National Fire and Transportation filed a Motion for Summary of Judgment or, in the Alternative, Partial Summary Judgment. (Doc. 78.) Many of the Defendants opposed the motion and filed Motions for Partial Summary Judgment of their own with regard to the businessowner policy coverage: the Larsens (Doc. 108); the Saylors (Doc. 109); the Shooks (Doc. 113); the Landsverks (Doc. 115); Pummill (Doc. 117); the Pipers (Doc. 119); Tupper (Doc. 121); Staley (Doc. 123); and the ACS Defendants (Doc. 125).

Second, Medical Protective filed a Motion for Partial Summary Judgment. (Doc. 136.) The relevant Underlying Plaintiffs opposed. In addition, Underlying Plaintiffs Larsen (Doc. 167) and Saylor (Doc. 184) filed cross-motions for summary judgment.

Third, Lexington filed a Motion for Partial Summary Judgment. (Doc. 138.) Once again, many of the Defendants opposed. The Saylors filed a separate Motion for Partial Summary Judgment against Lexington. (Doc. 188.) Pummill (Doc. 245) and the Landsverks (Doc. 266) have joined the Saylors' Motion.

Finally, Medical Protective has filed a Motion to Strike (Doc. 249) arising out of a briefing dispute with the Larsens. In short, the issue of coverage for the ACS Defendants and Dr. Lewis under all of the relevant policies is before the Court.

For the following reasons, the Court grants in part and denies in part the Motion for Summary Judgment filed by National Fire and Transportation, and denies the relevant cross-motions. The Court also grants in part and denies in part the motions for summary judgment filed by Medical Protective and Lexington. The cross-motions for summary judgment filed by Underlying Plaintiffs Larsen and Saylor are likewise granted in part and denied in part. Finally, Medical Protective's Motion to Strike is granted.

## DISCUSSION

## I.   LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

## II.   ANALYSIS

No party contests that Arizona law applies to this case. Interpretation of an insurance policy is a question of law, and is often an appropriate issue for the Court to

resolve on cross-motions for summary judgment. *See Keggi v. Northbrook Prop & Cas. Ins. Co.*, 199 Ariz. 43, 46, 13 P.3d 785, 788 (Ct. App. 2000); *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998). Arizona law directs courts to construe an insurance contract "according to [its] plain and ordinary meaning." *Keggi*, 199 Ariz. at 46; *see Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 469, 224 P.3d 960, 966 (Ct. App. 2010). "If a clause may be susceptible to different constructions . . . [the Court] will first attempt to discern the meaning of the clause by examining the purpose of the exclusion in question, the public policy considerations involved and the transaction as a whole." *Keggi*, 199 Ariz. at 46 (internal quotations omitted). "Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Id*. Only when an insurance contract is actually ambiguous will a court employ other canons of construction, such as construing the ambiguity against the insurer, see *Thomas v. Liberty Mutual Insurance Co.*, 173 Ariz. 322, 325, 842 P.2d 1335, 1338 (Ct. App. 1992), or favoring the protection of the interests of injured victims, see *American Family Mutual Insurance Co. v. White*, 204 Ariz. 500, 505, 65 P.3d 449, 454 (Ct. App. 2003).

### A.    Undisputed Claims

#### 1.    Coverage for the Pummill, Landsverk, Larsen, and Saylor Claims of Unnecessary Pacemaker Surgery

Underlying Plaintiffs Pummill, Landsverk, Larsen, and Saylor have asserted a claim of medical negligence against Dr. Lewis and the ACS Defendants that is separate from the allegations of inappropriate sexual contact. These Underlying Plaintiffs do not dispute that this claim is *excluded* from coverage under the businessowner policies. Likewise, Medical Protective agrees that its physicians policy provides coverage for direct claims against Dr. Lewis arising out of this specific instance of medical negligence.

Medical Protective has also agreed that, with respect to the pacemaker claims, there is coverage for all ACS Defendants under the corporate policy. (Doc. 227 at 2-3.)[7]

Lexington also agrees that its policy covers the separate instance of medical negligence. With regard to the Pummill Complaint, Lexington does argue that the unnecessary pacemaker surgery claim is not separate from the claims of sexual misconduct, but those arguments are unavailing. Nothing in the relevant paragraph of the Pummill Complaint references sexual misconduct. (Doc. 79, Ex. 1 at 7 (Pummill Compl. ¶ 17).)

Accordingly, Medical Protective is under a duty to defend and indemnify Dr. Lewis against these separate claims of medical negligence, and both Medical Protective and Lexington are under a duty to defend and indemnify the ACS Defendants against these same medical negligence claims.

### 2. Number of Incidents under Lexington and Medical Protective Policies

Medical Protective and Lexington move for summary judgment that the alleged multiple instances of sexual misconduct perpetrated on each of the potential victims constitutes one incident per victim for coverage purposes under their policies. With regard to the claims arising out of Dr. Lewis's alleged sexual misconduct, no Party opposes the motion. Consequently, to the extent coverage is available under the Medical Protective and Lexington policies, the collective molestations constitute one incident per victim for coverage purposes.

---

[7] As will be discussed further below, there remains a genuine issue of material fact whether Dr. Barker-Siegel is an insured under the Medical Protective policy with regard to the sexual assault claims. Medical Protective, however, while objecting to coverage for Dr. Barker-Siegel under the corporate agreement for the molestation claims, did not object to coverage for Dr. Barker-Siegel under the corporate agreement for the other claim of medical negligence.

### 3. Coverage for Punitive Damages under Lexington and Medical Protective Policies

Lexington and Medical Protective also move for summary judgment that both the Lexington and Medical Protective policies preclude coverage for punitive damages. No Party opposes this motion, and the Court will grant summary judgment for Lexington and Medical Protective on the issue of punitive damages.

### 4. Coverage for the Landsverk, Pummill, and Saylor Molestation Claims under the Medical Protective Policies

Medical Protective has moved for summary judgment that the Landsverk, Pummill, and Saylor molestation claims were made outside of the policy period and are therefore not covered. None of these Underlying Plaintiffs opposes this motion. Consequently, Medical Protective is under no duty to defend and indemnify the ACS Defendants or Dr. Lewis for the molestation claims made by Underlying Plaintiffs Landsverk, Pummill, and Saylor.

### 5. Coverage for the Larsen and Piper Molestation Claims Under The Lexington Policies

Lexington also moves for summary judgment that the Larsen and Piper claims were made outside of its policy period and are therefore not covered. Neither Larsen nor Piper opposes this motion. Consequently, Lexington is under no duty to defend and indemnify the ACS Defendants or Dr. Lewis for claims made by Underlying Plaintiffs Larsen and Piper.

### B. Claims for Assault And Battery, Medical Negligence, Intentional or Negligent Infliction of Emotional Distress, and Invasion of Privacy Arising out of Dr. Lewis's Alleged Sexual Misconduct

The Underlying Plaintiffs assert that the ACS Defendants are vicariously liable—and Dr. Lewis directly liable—for assault and battery, medical malpractice, intentional or negligent infliction of emotional distress, and invasion of privacy arising out Dr. Lewis's alleged sexual misconduct.

The General Liability Insurers claim that the businessowner policies do not cover any potential liability of their insureds for Dr. Lewis's actions. They assert that Dr.

Lewis's actions did not constitute an "occurrence" under the policies, or that, even if they did, the actions fall squarely within the professional services exception set forth in the policy.

Medical Protective contends that none of its professional liability policies provide coverage for Dr. Lewis or the ACS Defendants, either because the conduct at issue falls outside the scope of coverage set forth by the policies or falls within one of the coverage exceptions.

Likewise, Lexington asserts that the Lexington professional liability policies do not provide coverage for the ACS Defendants because Dr. Lewis's actions did not constitute a "medical incident arising out of professional services," or that, even if they did, the actions fall within other policy exceptions.

### 1.     Businessowner Policies

#### a.     "Occurrence" under the Businessowner Policies

The businessowner policies are general liability policies that provide coverage for "'bodily injury' . . . caused by an 'occurrence' . . . during the policy period." (Doc. 79, Affidavit Exs. 2 & 3, at NFI00129, NFI00269, TI00103.) The insured under the businessowner policies is ACS. By their terms, the policies also cover Dr. Siegel because he is alleged to be an "executive officer" or "director" of ACS. (*Id.* at NFI00137, NFI00267, TI00111.) In addition, because these claims are for vicarious liability only, Dr. Barker-Siegel is covered as an "employee" of ACS. (*Id.* at NFI00138, NFI00268, TI00112.) Dr. Lewis is not an insured under either policy. None of the parties dispute that the "bodily injury" component of the coverage has been satisfied. Instead, the question is whether Dr. Lewis's actions constitute an "occurrence" under the policies. The policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at NFI00142, NFI00282, TI00116.)

Notably, the policies do not cover "bodily injury" "expected or intended from the standpoint of the insured." (*Id.* at NFI00131, NFI00271, TI00105.) There is no indication that any of the ACS Defendants, which are the insured under the policy, would have expected or intended any injury that Dr. Lewis inflicted on the Underlying Plaintiffs. It is the perspective of the insured that is key in deciding whether a given event is an accident. *See Lennar Corp. v. Auto-Owners Ins. Co.*, 214 Ariz. 255, 264, 151 P.3d 538, 547 (Ct. App. 2007) (holding that even if some of the insureds intended to take action that would exclude them from coverage, other insureds that did not intend or expect such action would not be excluded from coverage.);[8] *Am. States Ins. Co. v. Borbor by Borbor*, 826 F.2d 888, 892 (9th Cir. 1987) ("[The wife's] liability for [the husband's] acts may be distinguished from her ability to insure against that liability," when she did not expect or intend her for her husband to abuse the children for whom they provided day care).

None of the parties contend that the ACS Defendants intended or expected Dr. Lewis to do what he did. The plain meaning of the word accident is "an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character," *Century Mutual Insurance. Co. v. Southern Arizona Aviation, Inc.,* 8 Ariz. App. 384, 386, 446 P.2d 490, 492 (1968), "which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured", *Western Casualty & Surety Co. v. Hays*, 162 Ariz. 61, 63, 781 P.2d 38, 40 (Ct. App. 1989). *See also* 16 Eric M. Holmes, et. al., *Holmes' Appleman on Insurance* § 117.3(B) at 241 (2d ed. 2000) ("[A]n accident is anything that happens or is the result of that which is unanticipated and takes place without the insured's foresight or expectation or intention."). While Dr. Lewis may have intended his actions, from the perspective of the ACS Defendants, the actions were "undesigned, sudden and unexpected events" that therefore meet the definition of an

---

[8] The definition of "occurrence" in *Lennar* was identical to the present case: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." 214 Ariz. at 261.

1
2
3
4
5
6
7
8

accident. The General Liability Insurers place great weight on *Continental Insurance Co. v. McDaniel*, 160 Ariz. 183, 187, 772 P.2d 6, 10 (Ct. App. 1988), which held that an insurer was not obligated to defend an insured who intentionally engaged in sexual harassment of an employee. The *McDaniel* court determined that general liability coverage for "occurrences" did not encompass intentional wrongdoing by one of the insured. *Id. McDaniel*, however, involved a question of direct liability, and not the question of vicarious liability presented here. Consequently, there has been an "occurrence" under the terms of the businessowner policies.

### b.  The Professional Services Exclusion

9
10
11
12
13
14
15

The businessowner policies contain a professional services exclusion. It states: "This insurance does not apply to: . . . 'Bodily injury' . . . caused by the rendering or failure to render any professional service."  (Doc. 79, Affidavit Exs. 2 & 3, at NFI00131, NFI00134, NFI00271, NFI00274, TI00105, TI00108.) While the policies do not provide a general definition for professional services, they state that the exclusion "includes but is not limited to . . . Medical [or] surgical . . . services treatment, advice or instruction; [and] any health or therapeutic service treatment, advice or instruction." (*Id.* at NFI00134, NFI00274, TI00108.)

16
17
18
19
20
21
22
23
24
25

The primary question is whether Dr. Lewis's actions—which caused the Underlying Plaintiffs' bodily injuries—amount to the "rendering or fail[ing] to render any professional service." (*Id.* at NFI00131, NFI00134, NFI00271, NFI00274, TI00105, TI00108.) In general, professional services "refer[] t------------o those services rendered by a person engaging in a recognized discipline that necessarily requires advanced training and specialized knowledge to perform." *W. Corr. Group, Inc. v. Tierney*, 208 Ariz. 583, 588, 96 P.3d 1070, 1075 (Ct. App. 2004). But "in determining whether a service is a professional one, we look at the nature of the involved acts rather than the title afforded the actor." *Id.*; *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 566, 720 P.2d 540, 541 (Ct. App. 1986).

Dr. Lewis was ostensibly deploying his "advanced training and specialized knowledge" when he performed the examinations and gave the consultations surrounding the alleged sexual abuse. Medical examinations and consultations certainly qualify as professional services. But, with the exception of the allegations of unwarranted pacemaker surgery, the Underlying Plaintiffs do not allege that Dr. Lewis's medical treatment caused their injuries. Instead, the underlying complaints detail various forms of molestation that occurred *during* the examinations and treatment. Whether the acts of molestation fall within the professional services exclusion thus depends on whether those acts can be viewed separately under Arizona insurance law from the medical services provided by Dr. Lewis.

In *Asbury*, a doctor "manipulated [patients'] clitorises while performing routine gynecological examinations." 149 Ariz. at 567. The issue was "whether the language 'providing or withholding of professional services' (with no applicable policy exclusions) provide[d] coverage for injuries and damages that result from unprofessional acts of a physician." *Id.* at 566.[9] The *Asbury* court explicitly rejected the distinction adopted by many courts between the doctor's professional services (gynecological exam) and unprofessional actions (manipulation of the patients' clitorises) and held that all of the doctor's actions fell under the umbrella of "professional services" within the meaning of the policy. *Id.* at 566-67. The court reasoned that the policy provided coverage because the "tortious sexual abuse of the patient [was] intertwined with and inseparable from the [professional] services provided." *Id.* at 567. In other words, the injuries were "made possible only because there were professional services rendered during this time and others which should have been rendered but were not." *Id.* A sufficient connection existed between the professional services offered by the doctor and the underlying

---

[9] The issue in *Asbury* was whether the doctor's actions were covered by his professional liability insurance—not whether a professional services exclusion applied. That distinction for present purposes—whether unprofessional acts of sexual abuse can be separated from the provision of professional services—does not make a difference.

misconduct because the underlying plaintiffs alleged that the doctor "manipulated their clitorises while performing routine gynecological examinations." *Id.*

This is not to say a doctor is engaged in professional services within the meaning of Arizona insurance law any time he molests a patient in the course of medical treatment. On the contrary, *Asbury* characterized decisions of other courts that did not extend the definition of professional services to cover molestation that occurred during medical treatment as resulting from those courts' determination that the molestations were insufficiently "intertwined with and inseparable from the [medical] services provided." It noted that "[o]ne example of noncovered sexual abuse not related to treatment is the case . . . where a physician's sexual molestation occurred with a patient who was being treated for hand injuries suffered in a wrestling match." *Asbury*, 149 Ariz. at 567 (citing *Hirst v. St. Paul Fire & Marine Ins. Co.,* 106 Idaho 792, 683 P.2d 440 (1984)). According to *Asbury*, no professional service coverage resulted in that instance because presumably the treatment of hand injuries was not sufficiently "intertwined with and inseparable from" the oral sex and masturbation which the doctor performed on a drugged patient against his will during the course of an office visit. *See Hirst*, 106 Idaho at 794, 796.

The *Asbury* court did nothing more to clarify just how a court is to determine the dividing line between molestations that are sufficiently "intertwined with and inseparable from" professional services to give rise to coverage, and those that are not.  Nevertheless, by distinguishing *Hirst* the court clearly held that sexual assault during medical treatment is not in itself sufficient to qualify as a professional service. Some connection between the type of treatment and the type of molestation is required.

In arguing that the professional services exemption placed in the businessowners policy does not exclude coverage to the extent that the ACS Defendants are vicariously liable for Dr. Lewis's acts, the Underlying Plaintiffs argue that Dr. Lewis could not have been providing professional services when he molested the Underlying Plaintiffs because

- 14 -

molestation is not a professional service. This is the exact same distinction between professional and unprofessional services rejected in *Asbury*. *Asbury* invites a different line of inquiry: if there is a close nexus between the alleged unprofessional sexual conduct of Dr. Lewis and his proffered professional treatment, Dr. Lewis's actions would qualify as professional services within the meaning of the exception. Each of the underlying claims assert that Dr. Lewis engaged in some variety of the following unprofessional conduct: "exposing Plaintiff's breasts for his personal viewing, fondling, and cupping plaintiff's breasts", "making inappropriate comments about [Plaintiff's] breasts", "having Plaintiff remove all of her clothes including her panties", "staring at [Plaintiff's] vagina, and pulling her legs apart", "manipulating his fingers under her panties and inserting his finger inside the lips of her vagina, feeling and touching all around the area around her vagina", "catheterizing [Plaintiff] without gloves", "conducting examinations with an erection", and "conducting examinations without a chaperone". (Doc. 79 ¶¶ 16-23; Doc. 111 ¶¶ 16-23.) Other complaint-specific accusations include "grabbing [Plaintiff's] right buttock"; and "asking [Plaintiff's] private information about her relationship with her spouse, ramming . . . fingers down [Plaintiff's] throat, squeezing [Plaintiff's] throat, and pulling [Plaintiff's] hair in a very sexual manner". (Doc. 79 ¶¶ 21, 23; Doc. 111 ¶¶ 21, 23.) The Underlying Plaintiffs allege that they "assumed and trusted that [Dr. Lewis] was doing [these things] for legitimate medical reasons." (Doc. 79 ¶¶ 16-23; Doc. 111 ¶¶ 16-23.)

It would hardly be unexpected for a cardiologist to examine the chest area of a patient. Thus the similarity between a cardiologist inappropriately fondling, examining, or otherwise commenting on the breasts of a patient, and a gynecologist inappropriately manipulating the clitoris of a patient, appears to be rather direct. In both situations, the doctor would have had an apparently legitimate reason to conduct an examination of the area of the body which he or she allegedly abused. In other words, the alleged inappropriate sexual touching of the breasts was "intertwined with and inseparable from"

- 15 -

the provision of professional services. *Asbury* controls as to these allegations. They constitute professional services and are thus excluded under the exemption to policy coverage.[10]

Nevertheless, the Underlying Plaintiffs also allege that Dr. Lewis inappropriately touched and viewed other areas of their bodies including their hair, throat, vagina, and buttocks, and that he conducted examinations with an erection. It is true that a cardiologist is concerned with the internal health of the body, which may manifest itself in various internal and external indicators not obvious to the Court. Nevertheless, the connection between cardiology and, for instance, vaginal manipulation is not nearly as direct as the allegations of fondling of the breast. On their face such allegations resemble something closer to *Hirst* than *Asbury.* And nothing provided by the Parties in the record demonstrates whether Dr. Lewis's examinations of the vaginal area and his patients' hair or throat were related to his professional work as a cardiologist. By contrasting the gynecologist who inappropriately manipulates the vagina with the doctor treating the hand who sexually assaulted his patient, *Asbury* makes clear that the relation between the sexual assault and the type of medical service offered matters when determining whether an act constitutes a professional service—for purposes of coverage or exclusion. Because the record is not yet clear on whether Dr. Lewis could have been legitimately acting within the purview of a cardiologist when he sought to view, viewed, touched or manipulated the vaginas, buttocks, throat, and hair of the Underlying Plaintiffs, summary judgment as to all of the underlying plaintiffs' claims is not appropriate. There remains a genuine issue of material fact to be decided.

---

[10] Saylor alleges that Dr. Lewis engaged in "sexually offensive conduct [that] occur[ed] after medical procedures had been completed." (Doc. 111, Ex. 12 at 54.) She has attached declarations that Dr. Lewis entered her room after the operation was over and grouped her. (*Id.* at 34-40.) For the reasons discussed, there appears to be a legitimate justification for a cardiologist to inspect the chest area after installation of a pacemaker. Consequently, this alleged incident remains intertwined with Dr. Lewis's treatment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The professional liability insurers in this case criticize *Asbury* and cite cases from other jurisdictions that likewise disapprove. Most persuasively, however, the insurers cite a subsequent Arizona Court of Appeals opinion, *Wilshire Insurance Co. v. S.A.* 224 Ariz. 97, 102, 227 P.3d 504, 509 (Ct. App. 2010). In *Wilshire,* a discerning panel of the Court of Appeals noted that, in arriving at its decision, the *Asbury* Court did not consider a policy set forth previously by the Arizona Supreme Court in *Transamerica Insurance Group v. Meere,* 143 Ariz. 351, 356, 694 P.2d 181, 186 (1984). In *Meere*, the Supreme Court recognized a public policy that forbids indemnifying a person against loss resulting from his own willful wrongdoing. The *Wilshire* court identified another case, decided after *Asbury*, *Phoenix Control Systems, Inc. v. Insurance Co. of North America,* 165 Ariz. 31, 35, 796 P.2d 463, 467 (1990), in which the Supreme Court again relied on the same public policy in interpreting an intentional acts exclusion. Thus, to the extent that the *Wilshire* court criticized *Asbury,* it did so based on its failure to consider *Meere* and the public policy against allowing an insured to be indemnified for a loss resulting from his own intentional wrongdoing. It did not criticize *Asbury* for its sometimes awkward test that distinguishes between professional and non-professional services when assaults occur in the context of medical treatment.

   "'When interpreting state law, federal courts are bound by decisions of the state's highest court.' . . . In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Trishan Air, Inc. v. Fed. Ins. Co.,* 635 F.3d 422, 427 (9th Cir. 2011). Decisions of Arizona's Court of Appeals are "'dat[a] for ascertaining state law which are not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.*'" *Martinez v. Asarco*, 918 F.2d 1467, 1471 n.4 (9th Cir. 1990) (quoting *Commissioner v. Bosch,* 387 U.S. 456, 465 (1967) (emphasis in original)). *Meere, Phoenix Control, McDaniel*, and *Wilshire* are sufficient

- 17 -

persuasive data upon which this Court determines that, even in light of *Asbury,* the Arizona Supreme Court would hold void as against public policy any insurance policy provision that would extend coverage to Dr. Lewis, as an insured, for his own intentional wrongdoing that he knew would result in harm to his patients.

Nevertheless, to the extent that *Asbury* sets forth a coverage test for sexual assaults inflicted by a physician in the course of medical treatment *as it relates to third parties who did not intend such conduct*, the insurers do not present sufficient data upon which this Court can determine that the Arizona Supreme Court would reject *Asbury*. The parties have set forth a few cases from other jurisdictions which have been critical of the admittedly strange relationship between type of professional services and the type of molestation that emerged from *Asbury*. But the mere existence of criticism from other jurisdictions regarding the *Asbury* standard, no matter how valid, does not mean that this Court can ignore long-standing Arizona law. *Asbury* has been the existing law in this state for twenty-six years without its core holding undermined by challenge or criticism from another Arizona court. As *Martinez* indicates, there is benefit in such circumstances of respecting the rule of *stare decisis* until the Arizona Supreme Court decides otherwise.

Thus, in the context of the businessowner policies it is sufficient to point out that while *Meere* and *Phoenix Control* do set forth a limited public policy that that forbids indemnifying a person against loss resulting from his own willful wrongdoing, it applies only to potential coverage for an *insured* who acts intentionally. There are no allegations that the ACS Defendants—the insured under the businessowner policies—acted "wrongfully or with a purpose to inflict injury." *Asbury* consequently controls as to coverage for claims that the ACS Defendants are vicariously liable for Dr. Lewis inappropriately viewing and fondling Underlying Plaintiffs' breasts. Such actions do amount to professional services by Dr. Lewis and are therefore excluded from the policies' coverage. However, questions of fact remain as to whether the other allegations pertaining to Dr. Lewis's sexual assaults constitute excluded professional services.

The General Liability Insurers are therefore under no duty to indemnify the ACS Defendants for claims that Dr. Lewis fondled, cupped, or otherwise engaged in inappropriate touching of the breast. As to the remaining claims of inappropriate conduct, there remains a genuine issue of material fact and summary judgment is not appropriate.

### 2.    Medical Protective Policies

#### a.    The Physicians Policy

The physicians policy covers Dr. Lewis and the ACS Defendants and insures them against "all loss arising from a health care occurrence." (Doc. 137 ¶ 22; Doc. 165 ¶ 22.) That policy defines "health care occurrence" as "any act in the furnishing of professional services which results in injury." (Doc. 137 ¶ 23; Doc. 165 ¶ 23.) "'Professional services' means treatment or peer review." (Doc. 137 ¶ 24; Doc. 165 ¶ 24.) "'Treatment' means health care services rendered to a patient[, including] medical [or] surgical . . . services." (Doc. 137 ¶ 25; Doc. 165 ¶ 25.) To the extent that the policy coverage is geared to "professional services," the standards set forth in *Asbury* apply. Nevertheless, as explained in greater detail above, to the extent that the physicians policy extends coverage to Dr. Lewis for his intentional acts that he knew would harm others, such policy provisions are void as prohibited by public policy under Arizona law. *See Meere,* 143 Ariz. at 356; *Phoenix Control Systems*, 165 Ariz. at 35. There is no coverage for Dr. Lewis under the physicians policy for allegations of sexual assault.

Further, while some vicarious liability claims against the ACS Defendants fall within the physicians policy, it also contains a number of exclusions. One of these is Exclusion D, which bars coverage for "any vicarious liability for the acts of a physician." (Doc. 137 ¶ 42; Doc. 165 ¶ 42.) Dr. Lewis is a physician. Nothing in Exclusion D limits the acts of a physician to the provision of professional services (thus implicating the *Asbury* distinctions). This exclusion therefore applies to bar all claims that the ACS Defendants are vicariously liable for actions committed by Dr. Lewis while he was treating his patients. Because Exclusion D clearly prohibits vicarious liability for all acts

of a physician, factual issues surrounding Dr. Lewis's touching of the vaginal area are not material to coverage under the physicians policy, as opposed to the businessowner policies. Consequently, Medical Protective is under no duty to defend or indemnify Dr. Lewis or the ACS Defendants under the physicians policy.

### b.    The Corporate Policy

The corporate policy covers ACS and its agents. (Doc. 59, Ex. B at 6.) The policy defines an agent as "a person who was acting within the scope of his or her duties as . . . an administrator." (*Id.* at 7.) The parties do not dispute that Dr. Siegel is an agent under the corporate agreement because the Underlying Plaintiffs have alleged that he is a director and stockholder in ACS. (*Id.*; Doc. 79 ¶¶ 9-10; Doc. 111 ¶¶ 9-10.) Neither do they dispute that Dr. Lewis is not covered under the corporate policy. But there is disagreement on whether Dr. Barker-Siegel qualifies as an agent and therefore has coverage under the corporate policy. Indeed, coverage for Dr. Barker-Siegel appears to be a hotly contested issue, at least judging by the amount of paper devoted to the subject by Medical Protective and the Larsen defendants.[11] As it stands, none of the relevant

---

[11] In its response to Medical Protective's Motion for Partial Summary Judgment (Doc. 164) and separate Motion for Summary Judgment against Medical Protective (Doc. 167), the Larsen defendants asserted that Dr. Barker-Siegel was covered under the corporate agreement (Doc. 164 at 8; Doc. 167 at 2). Medical Protective responded in its reply in support of its Motion for Partial Summary Judgment that there were, however, no allegations in any of the underlying complaints that Dr. Barker-Siegel acted in the capacity of an "administrator" or "committee member" within the definition of the policy. (Doc. 243 at 7-8; Doc. 59, Ex. B at 6.)

Subsequently, the Larsen defendants included in their reply in support of their separate Motion for Summary Judgment an argument sounding in Arizona property law to support extending coverage under the corporate agreement to Dr. Barker-Siegel. (Doc. 244 at 5-6.) The inclusion of this argument in the Larsen reply brief prompted Medical Protective to file a Motion to Strike this new argument raised by the Larsens in their reply brief. (Doc. 249 at 2-4.) The Court does not consider arguments raised for the first time in a reply. *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [the] reply brief are deemed waived."); *Marlyn Nutraceuticals, Inc. v. Improvita Health Prods.*, 663 F. Supp. 2d 841, 848 (D. Ariz. 2009) ("The Court need not consider Defendants' position, however, since it was first raised in their reply brief ... Thus, even if the argument has merit, this Court cannot appropriately consider it,

Underlying Plaintiffs have provided evidence in their motions as to Dr. Barker-Siegel's role or duties at ACS. As the parties moving affirmatively for summary judgment that Dr. Barker-Siegel is covered under the corporate policy, they bear the burden to present facts—not mere allegations—to support that claim. *See Alanco Tech., Inc. v. Carolina Cas. Ins. Co.*, No. CV-04-789-PHX-DGC 2005 WL 6242303 at *4 n.4 (D. Ariz. May 19, 2005) (requiring party moving for summary judgment on question of insurance coverage to have provided evidence that policy covered a certain entity); Fed. R. Civ. P. 56(e) (stating that the party opposing or brining a motion summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... set forth specific facts showing that there is a genuine issue for trial"); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). They have not done so. Accordingly, Dr. Barker-Siegel is not covered under the corporate policy.

The coverage terms of the corporate policy are identical to the physicians policy and therefore cover claims against ACS and Dr. Siegel arising out of Dr. Lewis's inappropriate sexual touching and/or viewing of the breasts under the analysis provided above. The record is insufficient to determine whether coverage extends for claims that Dr. Lewis inappropriately touched other areas of the body. Proceeding with the question of coverage for the covered claims requires an examination of the "General Exclusions" provisions because there is no vicarious liability exception in the corporate policy. General Exception A excludes from coverage claims for "any loss arising from any of the following acts committed by, or at the direction of, an insured": (1) "any malicious act or intentional tort", (2) "any sexual activity, behavior or conduct, whether under the guise of treatment or not", and (3) "any criminal act or willful violation of any law, statute or

---

since Plaintiffs did not have the opportunity to respond.") Accordingly, the Motion to Strike is granted.

1   regulation." (Doc. 59, Ex. B at 25.) Medical Protective argues that each of the three
2   exclusions independently bar coverage for ACS and Dr. Siegel for the vicarious liability
3   claims.

4       However, the exclusions apply only when the excluded acts have been "committed
5   by, or at the direction of, an insured." (*Id.*) The inclusion of this clause results in a
6   significant limitation on the scope of the exclusions. When an exclusion contains an "an
7   insured" limitation, that exclusion requires that one of the insured parties actually commit
8   the specified action. *See United Servs. Auto. Ass'n v. DeValencia*, 190 Ariz. 436, 949
9   P.2d 525 (Ct. App. 1997) (business pursuits exclusion did not apply to actions of a boy
10  because "an insured" language required that the boy himself be involved in business).
11  Here, the corporate policy defines "[a]n insured" as "any person or entity entitled to
12  coverage under the applicable *Insuring Agreement*." (Doc. 59, Ex. B at 23) (emphasis
13  added). Dr. Lewis is not an insured under the corporate policy. And none of the
14  Underlying Plaintiffs have alleged that the ACS Defendants themselves have committed
15  the inappropriate sexual touching or that they directed Dr. Lewis to engage in those
16  actions. Because no one contends that the ACS Defendants themselves either committed,
17  or directed Dr. Lewis to commit, the excluded actions, ACS and Dr. Siegel retain at least
18  some coverage under the corporate policy.

19      To summarize, there is no coverage for Dr. Lewis under any Medical Protective
20  policy for the assault and battery, medical negligence, intentional infliction of emotional
21  distress and invasion of privacy claims, but there is coverage under the corporate policy
22  for the potential vicarious liability of the ACS and Dr. Siegel for claims that Dr. Lewis
23  inappropriately touched the Underlying Plaintiffs' breasts. Coverage for the remaining
24  claims depends on as of yet unresolved factual questions.

3.     **Lexington Policies**

a.     **Medical Incidents Arising out of Professional Services.**

The Lexington policies provide the following coverage for all ACS Defendants:[12] "We will pay those sums that an Insured becomes legally obligated to pay others as damages resulting from a medical incident arising out of professional services." (Doc. 139, Lexington SOF, ¶ 24; Doc. 183, ¶ 24; Doc. 212, Lexington Response, ¶ 24.) The Lexington policies define "medical incident" as "any act, error or omission in the providing of or failure to provide professional services to any one patient." (Doc. 139, Lexington SOF, ¶ 25; Doc. 183, ¶ 25; Doc. 212, Lexington Response, ¶ 25.) "Professional services" mean, in relevant part, "[m]edical, surgical, . . . or other health care services." (Doc. 139, Lexington SOF, ¶ 25; Doc. 183, ¶ 25; Doc. 212, Lexington Response, ¶ 25.)

To the extent that the policies reference professional services, *Asbury* controls and there is coverage for claims that the ACS Defendants are vicariously liable for Dr. Lewis's groping and fondling of Underlying Plaintiffs' breasts. As with the businessowner policies, there remains a genuine issue of material fact as to whether Dr. Lewis was engaged in cardiological treatment when he touched other areas of the Underlying Plaintiffs' bodies. There is thus coverage under the Lexington policy for some of the assault claims, and there may be coverage for the other claims. As discussed below, however, all of the touching involved falls within the policy exceptions.

b.     **The Criminal Acts and Statutory Violation Exclusions**

The Lexington policies include exclusions that prohibit coverage for "any medical incident, claim or suit arising out of" two excepted categories of behavior: "[d]ishonest, fraudulent, criminal or malicious acts" (the "criminal acts exclusion"), and "violation of

---

[12] Dr. Lewis is not among the insured.

any statute, ordinance, rule or regulation" (the "statutory violation exclusion").[13] (Doc. 139, Lexington SOF, ¶¶ 28, 30; Doc. 183, ¶¶ 28, 30; Doc. 212, Response to Lexington SOF, ¶¶ 28, 30.) Dr. Lewis pled guilty to aggravated assault against seven of the eight plaintiffs in this case: Larsen, Saylor, Shook, Landsverk, Pummill, Piper, and Tupper. (Doc. 169, Exhibit 1, p. 7-11; Doc. 165, Exhibit A, p. 19-54; Doc. 139, Exhibit 1, p. 2-15.) Aggravated assault is a class 6 felony under Arizona law. A.R.S. §§ 13-1203, 1204(A)(4), 1204(D). Dr. Lewis pled guilty to "recklessly caus[ing] injury" to the seven Underlying Plaintiffs "while [their] capacity to resist was substantially impaired by virtue of the doctor-patient relationship." (Doc. 165, Exhibit A, p. 34-50.)

Unless specifically stated otherwise in the policy agreement, criminal act and statutory violation exclusions apply to both intentional and reckless criminal conduct. *Am. Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 503-04, 65 P.3d 449, 452-53 (Ct. App. 2003) (rejecting the position that a violation of law exclusion applied only to intentional criminal conduct). Arizona law precludes a "defendant convicted in a criminal proceeding . . . from subsequently denying in any civil proceeding brought by the victim . . . against the criminal defendant the essential allegations of the criminal offense of which he was adjudged guilty." A.R.S. § 13-807.

The Underlying Plaintiffs have brought civil claims for assault and battery, medical malpractice, intentional or negligent infliction of emotional distress, and invasion of privacy against the ACS Defendants on the theory that they are vicariously liable for Dr. Lewis's actions. Some of these vicarious liability claims against the ACS Defendants fall squarely within the criminal acts and statutory violation exclusions because they are

---

[13] Lexington also cites the "intended acts exclusion," which removes coverage for "[d]amages or harm expected or intended from an insured's standpoint." (Doc. 139, Lexington SOF, ¶ 29; Doc. 183, ¶ 29; Doc. 212, Response to Lexington SOF, ¶ 29.) Because there are no allegations that the insureds in question—the ACS Defendants—intended or expected the injuries suffered by the Underlying Plaintiffs, the intended acts exclusion is not in play.

- 24 -

claims "arising out of . . . criminal . . . act[s] . . . [and] violation[s] of a[] statute, ordinance, or regulation"—the assaults committed by Dr. Lewis (Doc. 139, Lexington SOF, ¶¶ 28, 30; Doc. 183, ¶¶ 28, 30; Doc. 212, Response to Lexington SOF, ¶¶ 28, 30.) For these purposes, the assaults encompass any inappropriate touching, obviating the need to draw an *Asbury* distinction for coverage purposes. Even if the touching of areas other than the breasts is covered, it would fall within the criminal acts exception. Still, there are allegations that Dr. Lewis made inappropriate comments about the Underlying Plaintiffs' breasts or inappropriately asked them to disrobe. These actions are not necessarily criminal, although they may be "malicious" or violate a statute within the meaning of the policy. The Court lacks information from the Parties on that issue. However, all of the Underlying Plaintiffs who alleged inappropriate comments also alleged that all of Dr. Lewis's misconduct violated criminal law. (Doc. 79, Ex. 1 at 9, 27, 46, 73, 92; Doc. 111, Ex. 1 at 55.) It is the allegations of the complaint that determine insurers' duties at this stage. *See Lennar Corp. v. Auto-Owners Ins. Co.*, 214 Ariz. 244, 261, 151 P.3d 538, 543 (Ct. App. 2007). The Underlying Plaintiffs placed all of their allegations squarely within the exception.

Lexington is under no duty to indemnify the ACS Defendants against the claims brought by the Underlying Plaintiffs for assault and battery, medical malpractice, intentional or negligent infliction of emotional distress, and invasion of privacy arising out of Dr. Lewis's criminal misconduct.

### C.   Negligent Hiring, Retention, and Supervision Claims

The Underlying Plaintiffs bring claims directly against the ACS Defendants for the negligent hiring, retention, and supervision of Dr. Lewis. The General Liability Insurers again claim that they have no duty to indemnify or defend ACS and the Siegels against the direct liability claims because the claims derive from actions that either do not constitute an occurrence or fall within the professional services exclusion. Medical Protective likewise objects to coverage for the derivative claims under both the

- 25 -

physicians and corporate policies. Lexington similarly contends that the direct liability claims do not fall within the policy's coverage.

### 1.    The Businessowner Policies

#### a.    An "Occurrence"

As discussed above, the businessowner policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 79, Affidavit Exs. 2 & 3, at NFI00142, NFI00282, TI00116.) The policies do not cover injuries "expected or intended from the standpoint of the insured." (*Id.* at NFI00131, NFI00271, TI00105.) The parties' dispute centers on whether the negligence claims against ACS and the Siegels fall within the "continuous or repeated exposure to . . . harmful conditions" category of occurrences.

While there does not appear to be specific Arizona law that covers the present circumstances, a similar situation appeared in the recent case of *Interstate Fire & Cas. Co., Inc. v. Roman Catholic Church of the Diocese of Phoenix*, CV-09-01405-PHX-NVW, 2011 WL 587163 (D. Ariz. Feb. 8, 2011). There, an insurer claimed that it did not have to defend or indemnify the Diocese of Phoenix against various negligence claims brought by plaintiffs who were the victims of molestation. *Id.* at *3. The insurer argued that facts giving rise to the claims, such as negligent supervision, hiring, retention, and failure to report, did not amount to an "occurrence" under the Diocese's general liability policy.[14] Judge Wake rejected that claim: "As to whether there was an 'accident or a happening or event or a continuous or repeated exposure to conditions,' the Court finds that the conduct underlying the various negligence-based claims, namely, failure to prevent sexual molestation, qualifies as an 'exposure to conditions' and thus falls within

---

[14] Occurrence was defined in the policy as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period." *Diocese of Phoenix*, 2011 WL 587163 at *2. None of the parties contend that the minor differences in the definitional language are important to this case.

- 26 -

the definition of 'occurrence.'" *Id.* at *7. Other courts have taken the same approach in molestation cases. *See Interstate Fire & Cas. Co. v. Archdiocese of Portland in Oregon*, 35 F.3d 1325, 1239 (9th Cir. 1994) ("[T]he terms of the policy make clear that . . . it is the repeated 'exposure' of the boy to the negligently supervised priest, resulting in injury, that provides the basis for indemnification."); *Guideone Ins. Co. v. St. Andrews Episcopal Church*, CV-03-2222-PCT-MHM (D. Ariz. Mar. 31, 2006) (refusing to grant summary judgment on issue of insurance coverage for failure to supervise claim because the actions could constitute an occurrence).

The present dispute is analogous to the clergy cases, which the Court finds persuasive. The Underlying Plaintiffs allegedly suffered physical invasions because of the carelessness of the ACS Defendants. Thus by allegedly hiring, retaining, and then failing to supervise Dr. Lewis, the ACS Defendants "exposed" the Underlying Plaintiffs to the "harmful condition" of sexual assault and battery. The actions giving rise to the negligence claims constitute an "occurrence" within the meaning of the businessowner policies.

### b.    The Professional Services Exclusion.

The General Liability Insurers again assert that the professional services exclusion applies to bar coverage. The exclusion applies to "'[b]odily injury' . . . caused by the rendering or failure to render any professional service. This includes but is not limited to . Supervisory . . . services; . . . Medical, surgical . . . advice or instruction; [and] any health or therapeutic service treatment advice or instruction." (Doc. 79, Affidavit Exs. 2 & 3, at NFI00131, NFI00134, NFI00271, NFI00274, TI00105, TI00108.) While the policy does not define supervisory services, claims that the ACS Defendants negligently supervised and retained Dr. Lewis fall squarely in that portion of the professional services exclusion. No party explains how an action for negligent retention would be separate from a claim for negligent supervision. There is therefore no coverage for those claims since they are specifically barred under the policy. As to the negligent hiring claim, the exercise of

- 27 -

hiring an employee is not necessarily the same thing as supervising an employee. Therefore, given the canons of construction for insurance policies, the Court cannot conclude that the negligent hiring claim falls within the supervisory services section of the professional services exception. *See Thomas v. Liberty Mut. Ins. Co.*, 173 Ariz. 322, 325, 842 P.2d 1335, 1338 (Ct. App. 1992) (construe ambiguity against insurer).

The General Liability Insurers stress that because Dr. Lewis caused the injuries to the Underlying Plaintiffs while he was engaged in an excluded activity—*Asbury*'s mixed professional services—"derivative" legal claims such as negligent hiring are likewise excluded from coverage. The Underlying Plaintiffs and the ACS Defendants object, insisting that the principle of severability and separation of insureds, combined with the narrowness of the professional services exception in the Businessowner Policies, keep the negligence claims out of the exclusion.

As a general matter, Arizona law is clear that negligence claims deriving from an excluded activity are themselves typically excluded. *See, e.g.*, *Am. Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 508, 65 P.3d 449, 457 (Ct. App. 2003) (denying coverage for claim of negligent supervision against parents of child who engaged in excluded activity—violation of criminal law—because the negligent supervision claim "derives from the claim against Travis, which is excluded"); *Behrens v. Aetna Life & Cas.*, 153 Ariz. 301, 302, 736 P.2d 385, 386 (Ct. App. 1987) (a claim for negligent entrustment or supervision was inseparable from the excluded negligent operation of a boat); *Lumbermens Mut. Cas. Co. v. Kosies*, 124 Ariz. 136, 138, 602 P.2d 517, 519 (Ct. App. 1979) ("It is evident that negligent entrustment as a distinct and specific cause of action is not exclusive of, but rather is derived from, the more general concept of ownership, operation and use of a motor vehicle."). In other words, the "focus of an exclusion should be the injury, not the pleaded cause of action." *White*, 204 Ariz. at 508, 65 P.3d at 457 (citing *Nw. G.F. Mut. Ins. Co. v. Norgard*, 518 N.W.2d 179, 184 (N.D. 1994)). When the allegations raised against the party seeking coverage do not exist separate and apart from

- 28 -

the excluded action, there is no coverage. *See Colony Ins. Co. v. Events Plus, Inc.,* 585 F. Supp. 2d 1148, 1155 (D. Ariz. 2008).

The contractual language here excludes from coverage any bodily injury "caused by the rendering or failure to render any professional service." Dr. Lewis allegedly used the provision of professional services to cloak his tortious conduct, which "caused" bodily injuries to the Underlying Plaintiffs. And the Court determined above that Dr. Lewis was engaged in professional services under the terms of the businessowner policies when he engaged in inappropriate sexual touching of the breast area. As Arizona law makes clear, courts will not engaging in strained hair-splitting where the alleged negligence of a party is entirely dependent on the actions of another party. The negligent conduct of ACS and the Siegels cannot be divorced from the excluded conduct of Dr. Lewis. Nevertheless, the *Asbury* distinction made earlier applies with equal force here. Allegations that Dr. Lewis inappropriately touched other areas of the body may not be sufficiently intertwined with medical treatment to qualify as professional services. It follows that negligence claims deriving from that conduct would likewise not be excluded.

The Underlying Plaintiffs and ACS Defendants rely heavily on *Diocese of Phoenix*, in which Judge Wake refused to apply an assault-and-battery exception to derivative negligence claims against the Diocese. 2011 WL 587163 at *10-11. That reliance is misplaced. The assault and battery exclusion at issue in *Diocese of Phoenix* was significantly narrower than the professional services exclusion. There, the policy "expressly preclude[d] coverage for 'liability of *any Assured* for assault and battery committed by or at the direction of *such Assured*. . . .'" *Id.* at *9 (emphasis in original). Judge Wake found the clause to be quite limited in application: only assaults and batteries committed at the direction of the Diocese would be excluded. *Id.* at *10-11. He contrasted the *Diocese of Phoenix* clause with the clause in *White*, which excluded "bodily injury or property damage arising out of . . . violation of any criminal law for

which any insured is convicted," 204 Ariz. at 503, 65 P.3d at 452. *Diocese of Phoenix*, 2011 WL 587193 at *9. He concluded,

> Had the clause instead excluded all claims arising out of an assault or battery, such a clause could have excluded from coverage claims of derivative liability of all innocent co-insureds for the tortfeasor's acts because derivative negligence claims arguably "arise out of" the underlying act. Without such language, though, all derivative liability claims cannot be so categorically excluded. Rather, in the assault and battery clause at issue here, the exclusion of liability attaches only to the person who committed or directed the act and only excludes coverage for the tortfeasor. As such, the Court concludes that the clause only precludes coverage of the direct liability of any insured who commits or directs an assault or battery. Because the derivative claims against the Diocese are not premised on allegations that the Diocese committed or directed an assault or battery, the claims do not fall within the assault and battery exclusion.

*Id.* at *10.

The professional services exception contained in the businessowner policies bears little resemblance to the assault and battery exception of *Diocese of Phoenix*. There is no extra language in the businessowner policies that requires the ACS Defendants themselves to have committed the injury-causing offense. The professional services exception means what it says—no coverage for injuries "*caused by* the rendering or failure to render any professional service," (Doc. 79, Affidavit Exs. 2 & 3, at NFI00131, NFI00134, NFI00271, NFI00274, TI00105, TI00108) (emphasis added), no matter how they are asserted.

The Underlying Plaintiffs nonetheless insist that the "Separation of Insureds" clause in the businessowner policies requires the Court to determine whether the ACS Defendants were engaged in professional services when they hired Dr. Lewis, rather than resting on the determination that Dr. Lewis was engaged in professional services when he allegedly caused the injuries. For support, they cite *United Services Automobile Ass'n v. DeValencia*, 190 Ariz. 436, 949 P.2d 525 (Ct. App. 1997), where several children were

molested by a minor child of a couple who provided day care. The victims brought intentional tort claims against the child and negligent supervision claims against the family. The homeowners' policy at issue in *DeValencia* excluded coverage for injuries "arising out of or in connection with a business engaged in by an insured." *Id.* The *DeValencia* court held that the policy did not exclude the minor child's actions, even though the actions would not have occurred but for the parents' business activities. *Id.* at 438, 949 P.2d at 527. In the eyes of the Underlying Plaintiffs and ACS Defendants, *DeValencia* means that the ACS Defendants themselves must have performed professional services for the exclusion to apply. Once again, they ignore important limiting language in the *DeValencia* policy. That language—"business engaged in by *an* insured"—expressly required that each insured himself be engaged in business. No such limitation is present in the professional services exclusion. Absent the "an insured" limitation, an exclusion generally bars coverage for claims derivative of excluded activities. *See e.g.*, *White*, 204 Ariz. at 507-08, 65 P.3d at 456-57; *Allstate Ins. Co. v. Kim*, 121 F. Supp. 2d 1301, 1308 (D. Haw. 2000) (citing cases).

In sum, because the claims against the ACS Defendants for negligent retention, and supervision fall squarely within the professional services exception, there is no duty to indemnify any of those claims. With regard to the negligent hiring claim, there remains an issue of material fact. There is no coverage for negligent hiring with regard to allegations of inappropriate touching of the breasts, because that claim derives from actions taken by Dr. Lewis under the guise of professional medical services, and the professional services exclusion applies. As for the claims that Dr. Lewis inappropriately touched other areas of the body, the record is insufficient to determine whether the derivative negligent hiring claim likewise falls within the professional services exclusion.

### c.    Reimbursement For General Liability Insurers

The General Liability Insurers assert their entitlement to reimbursement of the defense expenses they have incurred defending the ACS Defendants in the underlying

- 31 -

cases. National Air and Transportation have provided for the defense of ACS and the Siegels under a complete reservation of rights. (Doc. 79 ¶¶ 50-51; Doc. 111 ¶¶ 50-51.) Pursuant to this Order, the General Liability Insurers have no duty to indemnify the ACS Defendants against the following claims: (1) vicarious liability for assault and battery, medical malpractice, intentional or negligent infliction of emotional distress, and invasion of privacy relating to Dr. Lewis's alleged groping and fondling of the Underlying Plaintiffs' breasts; (2) vicarious liability for medical negligence arising out of Dr. Lewis's recommendation of unnecessary medical procedures for Underlying Plaintiffs Ms. Pummill, the Landsverks, and the Saylors; and (3) direct liability for negligent retention, and supervision. In Arizona, however, "if any claim alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the entire suit, because it is impossible to determine the basis upon which the plaintiff will recover (if any) until the action is completed." *W. Cas. & Sur. Co. v. Int'l Spas of Ariz., Inc.*, 130 Ariz. 76, 80, 634 P.2d 3, 6 (Ct. App. 1981); *see also Scottsdale Ins. Co. v. Van Nguyen*, 158 Ariz. 476, 477–78, 763 P.2d 540, 541–42 (Ct. App. 1988) (an uncovered, concurrent cause of harm does not defeat coverage if there is a separate, covered cause of harm); *Lennar Corp. v. Auto-Owners Ins. Co.*, 214 Ariz. 255, 261, 151 P.3d 538, 544 (Ct. App. 2007). The General Liability Insurers have not been discharged from their duty to defend claims arising out of Dr. Lewis's alleged groping of other parts of the body. They therefore remain under a duty to defend the entire suit.

### 2.      Medical Protective Policies

The Parties have agreed that the Medical Protective physicians policy does not provide coverage for Dr. Siegel and Dr. Barker Siegel with regard to the derivative negligence claims. Therefore any coverage for ACS Defendants would fall under the corporate policy. The terms of the corporate agreement cover the negligence claims against ACS and Dr. Siegel arising out of Dr. Lewis's alleged groping of the breasts under the analysis provided with regard to the businessowner policies. Those negligence

claims cannot be separated from the underlying covered conduct. And for the reasons discussed earlier with the vicarious liability claims, none of the General Exclusions apply to the underlying conduct. Nor are there any applicable exclusions for supervisory services. Consequently, ACS and Dr. Siegel retain coverage under the corporate agreement. As with the businessowner policies, however, a factual question remains with regard to coverage for claims that Dr. Lewis groped areas of the Underlying Plaintiffs' bodies besides the breasts. To summarize, there is no coverage for Dr. Siegel and Dr. Barker-Siegel under the physicians agreement for the derivative negligence claims. There is coverage for ACS and Dr. Siegel under the corporate agreement for those claims to the extent they arise out of Dr. Lewis's inappropriate touching of the breasts.

### 3. Lexington Policies

As determined above with regard to the vicarious liability claims, Dr. Lewis's conduct, at least in part, qualifies as a "medical incident arising out of professional services." (Doc. 139, Lexington SOF, ¶ 24; Doc. 183, ¶ 24; Doc. 212, Lexington Response, ¶ 24.) Nevertheless, the criminal act and statutory violation exclusions apply with equal force here to all claims of sexual misconduct made by the Underlying Plaintiffs. Claims that the ACS Defendants were negligent in hiring, retaining, and supervising Dr. Lewis cannot exist separate and apart from his alleged criminal conduct. The derivative negligence claims thus qualify as "suit[s] arising out of . . . criminal . . . act[s] . . . [and] violation[s] of a[] statute, ordinance, or regulation." (Doc. 139, Lexington SOF, ¶¶ 28, 30; Doc. 183, ¶¶ 28, 30; Doc. 212, Response to Lexington SOF, ¶¶ 28, 30.) Because the Underlying Plaintiffs have alleged that all of Dr. Lewis's inappropriate sexual misconduct constituted violations of criminal law, the exception applies across the board and the Court need not draw the *Asbury* distinctions. The Underlying Plaintiffs and ACS Defendants pursue the "separation of insureds" line of argument again here, but the Court rejects it for the reasons discussed above. The plain language of the policy excludes all suits "arising out of" the excluded activities.

Therefore, Lexington has no duty to indemnify the ACS Defendants against claims of negligent hiring, retention, and supervision to the extent those claims arise out of Dr. Lewis's allegedly criminal sexual misconduct.

## CONCLUSION

Medical Protective is under a duty to defend and indemnify Dr. Lewis with regard to claims that Dr. Lewis is directly liable for medical negligence arising out of unnecessary pacemaker installation.

Medical Protective and Lexington are under a duty to defend and indemnify the ACS Defendants against claims that the ACS Defendants are vicariously liable for Dr. Lewis's medical negligence and any derivative negligence claims against the ACS Defendants stemming from the unnecessary pacemaker installation.

None of the insurers are under a duty to defend or indemnify Dr. Lewis with regard to claims sounding in assault and battery, medical negligence, intentional or negligent infliction of emotional distress, and invasion of privacy arising out of Dr. Lewis's alleged intentional sexual misconduct.

Under the terms of the corporate agreement, Medical Protective has a duty to defend and indemnify ACS and Dr. Siegel for claims by Underlying Plaintiffs Larsen and Piper that the ACS Defendants are vicariously liable for assault and battery, medical negligence, intentional or negligent infliction of emotional distress, and invasion of privacy arising out of Dr. Lewis's alleged inappropriate sexual contact with the breasts. A genuine issue of fact remains as to coverage for other allegations of inappropriate touching, which means Medical Protective must continue to defend the entire suit.

Lexington is under no duty to indemnify the ACS Defendants against any vicarious liability claim brought by the Underlying Plaintiffs.

National Fire and Transportation have no duty to indemnify the ACS Defendants against claims that the ACS Defendants are vicariously liable for the claims that arise out of Dr. Lewis's alleged inappropriate manipulation of, or comments about, the Underlying

Plaintiffs' breasts.  However, because there remains a genuine issue of material fact concerning coverage for the other allegations of misconduct, National Fire and Transportation must continue to defend the entire suit against the ACS Defendants.

Medical Protective has a duty to defend and indemnify ACS and Dr. Siegel against the Underlying Plaintiffs' derivative negligence claims arising out of Dr. Lewis's inappropriate touching of the breasts. And because a genuine issue of fact remains as to coverage for the remaining claims of inappropriate contact, Medical Protective must continue to defend the ACS Defendants against the entire suit.

Lexington is under no duty to indemnify the ACS Defendants against the derivative negligence claims brought by all Underlying Plaintiffs.

National Fire and Transportation are under no duty to indemnify the ACS Defendants with respect to the negligent retention and supervision claims. National Fire and Transportation likewise do not have a duty to indemnify the ACS Defendants against the negligent hiring claims arising out of Dr. Lewis's alleged inappropriate touching of the breasts. A genuine issue of fact remains regarding coverage for other inappropriate touching, and so National Fire and Transportation remain under a duty to defend the entire suit.

**IT IS HEREBY ORDERED** that the Motion for Summary of Judgment or, in the Alternative, Partial Summary Judgment filed by Plaintiffs National Fire Insurance Company of Hartford and Transportation Insurance Company (Doc. 78) is **granted in part and denied in part.**

**IT IS FURTHER ORDERED** that

1. The Motion for Partial Summary Judgment filed by Defendants Dena and Shawn Larsen (Doc. 108) is **DENIED.**

2. The Motion for Partial Summary Judgment filed by Defendants Franklin and Jennifer Saylor (Doc. 109) is **DENIED.**

3. The Motion for Partial Summary Judgment filed by Defendants Collin and Laurie Shook (Doc. 113) is **DENIED as moot.**

4. The Motion for Partial Summary Judgment filed by Defendants Julie and Stewart Landsverk (Doc. 115) is **DENIED.**

5. The Motion for Partial Summary Judgment filed by Defendant Kellye Pummill (Doc. 117) is **DENIED.**

6. The Motion for Partial Summary Judgment filed by Defendants Daniel and Elizabeth Piper (Doc. 119) is **DENIED.**

7. The Motion for Partial Summary Judgment filed by Defendant Lauri A. Tipper (Doc. 121) is **DENIED as moot.**

8. The Motion for Partial Summary Judgment filed by Defendant Brooke E. Staley (Doc. 123) is **DENIED as moot.**

9. The Motion for Partial Summary Judgment filed by Defendants Advanced Cardiac Specialists, Chartered, Barbara Barker-Siegel, and Robert M. Siegel (Doc. 125) is **DENIED.**

10. The Motion for Partial Summary Judgment filed by Plaintiff Medical Protective Company (Doc. 136) is **granted in part and denied in part.**

11. The Motion for Partial Summary Judgment filed by Plaintiff Lexington Insurance Company (Doc. 138) is **granted in part and denied in part.**

12. The Motion for Partial Summary Judgment filed by Defendants Dena and Shawn Larsen (Doc. 167) is **granted in part and denied in part.**

13. The Motion for Partial Summary Judgment filed by Defendants Franklin and Jennifer Saylor (Doc. 184) is **granted in part and denied in part.**

14. The Motion for Partial Summary Judgment filed by Defendants Franklin and Jennifer Saylor (Doc. 188) is **granted in part and denied in part.**

15. The Motion to Strike Reply to Response to Motion for Summary Judgment filed by Medical Protective is **GRANTED**.

Dated this 28th day of September, 2012.

G. Murray Snow
United States District Judge